IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION (JACKSON)

| | | |
|---|---|---|
| CHURCH JOINT VENTURE, A LIMITED PARTNERSHIP, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 12-cv-02999-SHM-tmp |
| EARL BENARD BLASINGAME AND MARGARET GOOCH BLASINGAME, KATHERINE BLASINGAME CHURCH, EARL BENARD "BEN" BLASINGAME, JR., BLASINGAME FAMILY BUSINESS INVESTMENT TRUST, BLASINGAME FAMILY RESIDENCE GENERATION SKIPPING CHILDREN TRUST, THE BLASINGAME TRUST, FLOZONE SERVICES, INC., FIBERZONE TECHNOLOGIES, INC., BLASINGAME FARMS, INC., GF CORPORATION, AND AQUA DYNAMICS SYSTEMS, INC., | § § § § § § § § § § § § § § | |
| Defendants. | § | |

## FIRST AMENDED ORIGINAL COMPLAINT

Plaintiff CHURCH JOINT VENTURE, a limited partnership ("**Plaintiff**" or "**Church JV**")) complains of Defendants EARL BENARD BLASINGAME, MARGARET GOOCH BLASINGAME, KATHERINE BLASINGAME CHURCH, EARL BENARD "BEN" BLASINGAME, JR., BLASINGAME FAMILY BUSINESSS INVESTMENT TRUST, BLASINGAME FAMILY RESIDENCE GENERATION SKIPPING TRUST, THE BLASINGAME TRUST, FLOZONE SERVICES, INC., BLASINGAME FARMS, INC., G. F. CORPORATION, FIBERZONE TECHNOLOGIES, INC., and AQUA DYNAMICS SYSTEMS, INC. (unless otherwise noted, collectively, the "**Defendants**"), as follows:

**FIRST AMENDED ORIGINAL COMPLAINT – Page 1**

## Jurisdiction and Venue

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201.

2.      Venue is appropriate in this District and Division pursuant to 28 U.S.C. § 1391(b).

## The Parties

3.      Plaintiff is an Ohio limited partnership with its principal place of business located at 100 North Center Street, Newton Falls, OH 44444.  As such it is a citizen of the State of Ohio.

4.      Defendant EARL BENARD BLASINGAME ("**EBB**") is an adult resident and citizen of Adamsville, Tennessee, presently residing at 337 South Maple Street, Adamsville, Tennessee 38310.  He may be served with a copy of this Amended Complaint on his attorney of record in this action.

5.      Defendant MARGARET GOOCH BLASINGAME ("**MGB**") is an adult resident and citizen of the State of Tennessee and residing at 337 South Maple Street, Adamsville, Tennessee 38310.[1]  She may be served with a copy of this Amended Complaint on her attorney of record in this action.

6.      Defendant KATHERINE BLASINGAME CHURCH ("**KBC**") is an adult resident and citizen of the State of Tennessee residing at 105 Westwood Trace, Nashville, Tennessee 37212.  She may be served with a copy of this Amended Complaint on her attorney of record in this action.

7.      Defendant EARL BENARD "BEN" BLASINGAME ("**Ben**") is an adult resident and citizen of the State of Tennessee residing at 4021 St. Andrews Lane, Spring Hill, Tennessee 37174.  He may be served with a copy of this Amended Complaint on his attorney of record in this

---

[1] EBB and MGB are sometimes referred to herein collectively as "**Debtors**."

action.

8.      Defendant BLASINGAME FAMILY BUSINESS INVESTMENT TRUST ("**BIT**") is a trust as to which EBB and MGB are co-trustee.  It may be served with a copy of this Amended Complaint on its attorney of record in this action.

9.      Defendant BLASINGAME FAMILY RESIDENCE GENERATION SKIPPING TRUST ("**BRT**") is a trust as to which EBB and MGB are co-trustee.  The BRT may be served with a copy of this Amended Complaint on its attorney of record in this action.

10.     Defendant THE BLASINGAME TRUST ("**BT**") is a trust as to which EBB is a Grantor and Louis Cima and Will Henley are the last known trustees.  The  BT may be served with a copy of this Amended Complaint on its attorney of record in this action.

11.     Defendant FLOZONE SERVICES, INC. ("**FSI**") is a corporation formed and organized under the laws of Delaware with its principal place of business being 330 South Maple Street, Adamsville, Tennessee 38310.  FSI may be served with a copy of this Amended Complaint by serving its attorney of record in this action.

12.     Defendant FIBERZONE TECHNOLOGIES, INC. ("**FTI**") is a corporation but the Tennessee Secretary of State has no record of its existence.  Its principal place of business is identified in Debtors' Petition to be 330 South Maple Street, Adamsville, Tennessee 38310, in the offices of Flozone Services, Inc.   FTI may be served with a copy of this Amended Complaint on its attorney of record in this action.

13.     Defendant BLASINGAME FARMS, INC. ("**BFI**") is a corporation formed and organized under the laws of the State of Tennessee with its principal place of business being 330 South Maple Street, Adamsville, Tennessee 38310.  It is alleged to be owned in whole by the BIT and may be served with process through  either EBB or MGB, the co-trustees of the BIT.  BFI may

**FIRST AMENDED ORIGINAL COMPLAINT – Page 3**

be served with a copy of this Amended Complaint through his attorney of record in this action.

14.     Defendant GF CORPORATION is a corporation formed and organized under the laws of the State of Tennessee with its principal place of business being 330 South Maple Street, Adamsville, Tennessee 38310.  GF Corporation may be served with a copy of this Amended Complaint through his attorney of record in this action.

15.     Defendant AQUA DYNAMICS SYSTEMS, INC.  ("**ADSI**") is a corporation formed and organized under the laws of the State of Tennessee with its alleged principal place of business being 330 South Maple Street, Adamsville, Tennessee 38310.  Its registered agent for service of process is EBB at the same address.

<u>**Facts**</u>

**A.     <u>Church JV is a Creditor of Debtors</u>**

16.     EBB and MGB filed bankruptcy under chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Tennessee, Memphis Division, on August 8, 2008, styled *In re Earl Benard Blasingame and Margaret Gooch Blasingame*, and referenced Case No. 08-28289-L (the "**Case**").[2]  EBB and MGB are sometimes referred to herein, collectively, as the "**Debtors**."

17.     In the Case, Debtors filed Schedules and Statements of Financial Affairs ("**SOFA**"), and amendments thereto, attesting to their assets and liabilities.

18.     At all times relevant to this action, Church JV and/or its predecessors were/was a creditor of the Debtors.  Church JV filed proofs of claim in the Case and is owed in excess of $4 million by Debtors.  There has been no objection to the claims of Church JV against Debtors.  The claims are valid, subsisting and owing by Debtors to Church JV.  Debtors' Schedules indicate other

---

[2] Church JV acquired the causes of action in this proceeding through purchase from the Debtors' bankruptcy estate. (*See* Case Dkt. No. 356).

**FIRST AMENDED ORIGINAL COMPLAINT – Page 4**

persons and entities are also creditors of the Debtors.

**B.      Debtors Reside on Property Purported to be Held in Trust**

19.      EBB and MGB reside at 337 South Maple Street, Adamsville, Tennessee 38310 (the "**Property**").

20.      The Property is a gated residence which sits upon 28± acres.  The main house has 8,700 square feet of living area, lavishly furnished with valuable antiques, expensive Oriental carpets and gallery art work.  Its furnishings and contents have been appraised at some $200,000 under forced sale conditions.   Near the main house is a 3,000± square foot, furnished "guest house."  There is a heated swimming pool with brick pool house.  There is a lighted, regulation tennis court.  There is a stable, a barn and fenced pasture for the horses.  There are three or more large storage buildings (est. 5,000+ sq. ft.) containing hundreds if not thousands of antiques, boats, off-road vehicles, farm equipment, trucks, tractors, etc.  EBB and MGB are the only occupants of the Property.  The cost to maintain Property is approximately $12,000 per month for maintenance, taxes, grounds keeping, maid service, utilities, etc.

**C.      The BRT**

21.      EBB and MGB assert that the Property and its contents and amenities are owned by the BRT.  Under the BRT instrument the Blasingames have not only a life estate but also are vested with the unrestricted discretionary power to transfer, dispose and spend all of the trust assets.

22.      The BRT was formed in 1993.

23.      Defendants EBB and MGB are co-trustees and beneficiaries of the BRT.

24.      The assets of the BRT include the Property, 28 adjacent acres, a rent house, a vacant lot which were contributed to the BRT by Defendants EBB and MGB.

25.      It is unclear as to what the original assets of the BRT were and/or what the assets of

**FIRST AMENDED ORIGINAL COMPLAINT – Page 5**

the BRT have been over time.  There is some evidence to the effect that the initial assets in the BRT came from EBB and MGB (the residence held by the BRT was allegedly acquired by EBB from his mother and then placed into the trust).  It has been reported that many of the assets in the BRT are located in the  residence occupied by Defendants EBB and MG, which is also an asset of the trust. No clear accounting of these transfers to and from the BRT to Defendants and/or others has been provided to date.  Nor has there been a clear accounting of what portion of these assets EBB and MGB claim is part of their personal property, not held by the BRT (which they list in the schedules filed in their personal bankruptcy case).  Without limitation, Plaintiff has discovered the following transfers relating to the BRT:

a.       MGB took the proceeds from the sale of some "property left by my mother," and deposited it into to Blasingame Family Residence Generation Skipping Trust (the "**BRT**") (*see* Depos. MGB, February 4, 2009 at 80-82).

b.   MGB contributed/deposited at least $90,641 of her personal property/money into a bank account at Community South Bank which is in the name of the BRT (*see* Depos. M. Blasingame, February 5, 2009, at 122-124).

c.   MGB contributed an undisclosed amount of money from her Symetra Annuity account into the bank account in the name of the BRT (see Depos. M. Blasingame, February 5, 2009, at 124-129).

d.   From January of 2007 through May 2008, MGB deposited at least $38,000 into the bank account of the BRT.  These deposits consisted of her earnings from the McNairy County School Board and the Symetra account.

Additional assets have been placed into the trust over time and assets have been transferred to and from the trust.

**FIRST AMENDED ORIGINAL COMPLAINT – Page 6**

26.     Defendants cannot explain amounts paid to Defendants from the BRT and/or for what specific purpose.  There has never been a true or correct accounting of transfers involving its bank accounts and other assets..  Nor can Defendants establish that transfers from the BRT to other trusts and business entities controlled by Defendants EBB and/or MGB.  No effective records to this effect exist and/or have been produced to date.

27.     Defendants EBB and MGB have received numerous distributions and/or transfers from the BRT for their benefit and have failed or cannot explain the use or disposition of such transfers or consideration therefore.

28.     Defendants EBB and MGB have personally benefited from disbursements by BRT for personal expenses and transfers of money from BRT have been made to BRT and other persons or entities controlled by Defendants EBB and MGB for the ultimate benefit, enjoyment and maintenance of Defendants EBB and MGB and maintainence of their lifestyle.

**D.     The BT**

29.     The BT was formed in 1983.

30.     The last known trustee(s) of the BT are Louis Cima and Will Henley.

31.     ADSI is owned by the BT and certain other minority investors.

32.     ADSI owns part of FSI.

33.     EBB is a major component and player in FSI – it cannot and would not exist without his involvement, no matter what FSI claims is its ownership.  Yet EBB receives no income or other compensation from FSI for his services rendered.  EBB provides value and valuable services to the BT through the fact that he is not compensated by FSI which is owned in part by ADSI which is owned by the BT.

34.     EBB was receiving Conservation Reserve Program ("**CRP**") payments from the US

Department of Agriculture at least from 2004 through 2009 and thereafter.  Payments were being made to EBB doing business as BFI.  EBB's social security number was used on the application to obtain CRP payments.  EBB claimed passive income from BFI and also profits from farming that he "materially" participated in on his 2005 and 2006 individual federal income tax returns.  On information and belief, EBB continues to receive and claim income after these dates, as well.

35.     On or about December 5, 2007, a check was written out of the BFI bank account in the amount of $2,000 to ADSI.  Further, without limitation, on or about December 11, 2007, a check was written out of the BFI bank account in the amount of $7,000 to ADSI.

**E.     The BIT and BFI**

36.     The BIT was formed in 1993.  Debtors are co-trustees and beneficiaries of the BIT.

37.     EBB and MGB allege that the assets of the BIT include, among other things, 100% of BFI (which may be owned individually by EBB and as to which Debtor EBB is President)**;** 205 acres adjacent to the Debtors' residence, GF Corp. (as to which Debtor M. Blasingame is President);[3] two rental properties; 1300 acres of farm land, and various investment accounts.  EBB and MGB quitclaimed real property that MGB received through inheritance from her mother to the BIT.

38.     Debtors cannot explain amounts paid to Debtors from the BIT and/or for what purpose.  Debtors cannot accurately testify as to transfers from the BIT to other trusts and business entities controlled by Debtors.  Debtors have not maintained effective records to this effect.

39.     Debtors have personally benefited from disbursements by BIT for personal expenses and transfers of money from BIT have been made to BIT and other entities controlled by Debtors for the ultimate benefit, enjoyment and maintenance of Debtors' and their lifestyle.

**FIRST AMENDED ORIGINAL COMPLAINT – Page 8**

40.    MGB deposited an undisclosed amount of money from an investment account at UBS in her "own name" into a bank account owned by the BIT.  MGB and EBB then benefited from her control and use of the BIT.  This is in addition to any money which may have been returned by MGB/EBB as part of a settlement with the chapter 7 trustee in their personal bankruptcy case.

41.    On information and belief, because a true and correct and accurate accounting of the assets in the trusts involved in this action, including the BIT and BRT have never been provided to Plaintiff.  On information and belief, the Blasingames – EBB and MGB – who are themselves beneficiaries of the trusts involved, have contributed personal property of their own, including but not limited to real and personal property – to include, on information and belief, EBB's one-third interest in paintings received by him from his mother's estate.  This is known to be true because the Blasingame s-EBB and MGB – have stated under oath that they have no personal assets that do not belong to the trusts at issue in this action.  Because they have added to the trusts and are also beneficiaries of the trusts involved in this action, which they claim in whole or in part, to be spendthrift trusts, the form of these trusts must be disregarded and purged for the benefit of Plaintiff and the trusts deemed to be invalid to the extent of all such contributions under applicable law.

42.    EBB received checks written to him from the BIT in excess of $60,000 from July 2006 through October 2008 and possibly thereafter based on discovery which is on-going.

43.    Also, on January 14, 2005, EBB and MBB quitclaimed property that they inherited from Evelyn Hipshire Gooch, to the BIT.

44.    EBB was a shareholder of BFI at least as of 2005 and 2006 and perhaps thereafter.  Mr. Donaldson prepared E. Blasginame's individual federal income tax returns.  Tax returns filed by BFI reflect that there were only one shareholder.  BFI was originally established as a

---

[3] GF Corp. has no employees and no business.  GF Corp. holds title to a 2008 Mercedes SUV which is used almost exclusively by Debtor M. Blasingame for personal business.

management company.  It no longer exists as merely a management company.  It is clearly a revenue generating enterprise.

45.     BFI was dissolved and/or its charter was revoked by the Secretary of State of Tennessee from February 18, 2005, until it was reinstated on July 11, 2011.  This was after the Blasingame's personal bankruptcy case was filed.  On information and belief, E. Blasingame controls the business, financial and management affairs of BFI and is and officer and/or director.

46.     EBB has received and, on information and belief, continues to receive payments under the United States Department of Agricultures' Conservation Reserve Program ("**CRP**") since 2004.  The payments were and are made directly to EBB d/b/a Blasingame Farms, Inc.  EBB's social security number was filed on the application for the CRP.  EBB claimed passive income from BFI and also profits from farming that he "materially" participated in on his 2005 and 2006 individual federal income tax returns.

47.     On or about February 14, 2007, E. Blasingame wrote a check for $301,000 to the BIT from the BFI bank account.

48.     On or about December 11, 2007, a check was written out of the BFI bank account for $6,000 to the BIT.

49.     MGB was and is not an employee of BFI and did not receive any compensation in the form of wages or reimbursement from BFI for the years prior to the filing of their personal bankruptcy in 2008.  On February 1, 2008, a check drawn on the bank account of BFI in the amount of $1,200 was deposited into the personal bank account of M. Blasingame.  There is no known consideration for this transfer.  On December 16, 2007, a check drawn on the bank account of BFI in the amount of $2,000 was deposited into the personal bank account of MGB.  There is no known consideration for this transfer.  Further, and without limitation, on or about December 2, 2007, a

**FIRST AMENDED ORIGINAL COMPLAINT – Page 10**

check was written out of the BFI bank account for $2,000 to FTI, a company also controlled, operated and/or managed by E. Blasingame – he claims he was a consultant - for no known consideration.

50.     Also, from April 2006 through August 2008, there were checks totaling in excess of $160,000 written from the BIT to BFI.  BFI is the assumed business name of E. Blasingame (*see also* responses to discovery requests served on Plaintiff by BFI for supporting documentation).

51.     Further, As of August 31, 2008, ADSI owed BFI $109,884 for some unknown reason and for no known consideration.  There has been no attempt by BFI, which is owned, controlled, and managed by EBB to collect this obligation from ADSI, a company over which EBB has control and dominion.  This asset is, therefore, being hidden and hindered from collection by his creditors.

**E.     FSI**

52.     FSI is a Delaware corporation formed in 2004.

53.     FSI offices in the same facility, across from the Property (Debtors' residence) in Adamsville, Tennessee, at which all of the books and records are kept for all entities and trusts which involve Debtors.

54.     KBC is Debtors' daughter.

55.     KBC is purported to be the President of FSI and owns 100% of its issued common stock.  Preferred Stock has also been issued by FSI.

56.     EBB is identified as a Vice-President of FSI.

57.  EBB is an officer of FSI.

58.  Debtors claim that KBC delegated all business and financial decisions of FSI to her father, EBB.

**FIRST AMENDED ORIGINAL COMPLAINT – Page 11**

59.  Neither Debtors, their bookkeeper, nor KBC can adequately account for or explain the amount KBC paid for her stock in FSI or how she acquired that stock.  No records to this effect have been produced to date.  No stock has been issued.

60.    Regarding FSI, without limitation, KBC has:

- never attended a meeting of the board of directors;

- never attended a shareholder meeting;

- never seen the books and records of FSI;

- no knowledge of what she paid for her stock;

- never seen a stock certificate issued to her or anyone else by FSI;

- never seen a financial statement of FSI;

- never transacted any business on behalf of FSI;

- never received any compensation from FSI;

- never been a signatory on any account of FSI and has not reviewed its financial books and records at any time;

- never signed a contract on behalf of FSI;

- never negotiated a contract on behalf of FSI;

- never made any employment decisions for FSI;

- never negotiated or signed a contract based on the fact that FSI is a "woman" owned business or has ever sought out a contract on this basis;

- never made a material management, business or financial decision for FSI; and,

- turned all of the financial and business operations of the company over to her father EBB.

61.    FSI was the inspiration of EBB.

**FIRST AMENDED ORIGINAL COMPLAINT – Page 12**

62.     FSI uses, manufactures, distributes, installs, and maintains products designed and engineered by or under the direction of EBB.

63.     EBB operates and runs FSI.  His automobile, insurance, and fuel are paid by FSI, as is his cell phone and related charges.

64.     KBC is not materially or significantly involved in the business of FSI.

65.     KBC has not made any independent business decisions for FSI.

66.     KBC does not run the business of FSI.

67.     FSI has no relationship to any of the Trusts involved in this action, yet its receives money from the Trusts and other entities controlled by Debtors.

68.     Until at or around the filing of the Case, EBB drew a salary from FSI and has benefited and continues to benefit financially from its operations.

69.     Check registers produced by Debtors indicate that Debtors have used its accounts for their personal benefit and transfers of an enormous amount of money from FSI have been made to BRT and BIT for the ultimate benefit, enjoyment and maintenance of Debtors' and their lifestyle.

F.     **ADSI**

70.     EBB serves as president of ADSI and makes all material business decisions for ADSI involving patenting, licensing and technology (see Depos. Joyce Long/ADSI, January 25, 2012, at 7-9).

71.     EBB has never received a salary or other compensation from ADSI (*see id*. at 7-12).

59      The BIT is the highest percentage owner of ADSI (see Depos. Joyce Long, December 19, 2008, at 408).

**FIRST AMENDED ORIGINAL COMPLAINT – Page 13**

72.     As of August 31, 2008, ADSI owed BFI (the assumed name of EBB) not less than $109,884 (*see* Depos. George Donaldson, February 25, 2009, at 37).   The purpose of these transfers has never been disclosed.   The consideration for these transfers is questionable.   EBB has failed or refused to recover or seek or demand recovery of these transfers.

E.     **FTI**

73.     On information and belief, FTI is owned by KBC, the daughter of EBB and MGB.

74.     EBB serves as a consultant to FTI.   FTI consults with EBB regarding marketing and engineering issues.   EBB provides these services for no consideration and has never received any compensation from FTI (*see* Depos. E. Blasingame, December 19, 2008, at 316-18).   E. Blasingame, acting on behalf of BFI transferred not less than $2,000 to FTI from bank accounts in the name of BFI.

75.     At the time EBB performed these unpaid for services, EBB and MGB were seriously indebted to creditors (*see* Depos. Joyce Long, December 19, 2008, at 323; Schedules and Statement of Financial Affairs, together with amendments, filed by the Blasingames in their personal bankruptcy case).   Transfers to and from FTI by the Blasingames or entities controlled by the Blasingames were made at a time when they were insolvent and indebted to creditors.

76.     Prior to August 2008 and continuing until at least February 2009 and thereafter, MGB obligated herself alone for repayment of any charges that may have been made or incurred by FTI on several credit cards (see Depos. M. Blasingame, February 5, 2009, at 172-182).

77.     EBB was receiving CRP payments from the US Department of Agriculture at least from 2004 through 2009 and thereafter.   Payments were being made to EBB, doing business as BFI.   EBB's social security number was used on the application to obtain CRP payments.   EBB claimed the CRP payments as Farm Income on his 2005 and 2006 personal federal income tax

return.  Further, on or about December 2, 2007, a check was written out of the BFI bank account for $2,000 to FTI for no consideration.

### F.   **Additional Suspect Transfers and Transactions**

78.    Church JV has discovered numerous pecuniary transfers of property and other transactions by FSI, BRT and BIT, for example:

| DATE | ITEM | GRANTOR | GRANTEE |
|------|------|---------|---------|
| | | | |
| 2/20/09 | Deed of Trust | GF Corp | Trustee |
| 2/20/09 | Deed of Trust | B/T | Trustee |
| 3/25/09 | Assignment of Deed of Trust | Central Bank, Savanah | Tommy Hurst |
| 3/25/09 | Assignment of Deed of Trust | Central Bank, Savanah | Tommy Hurst |
| 3/25/09 | Warranty Deed | Central Bank, Savanah | Tommy Hurst |
| 4/06/09 | Deed of Trust | B/T | Trustee |
| 5/13/09 | Deed of Trust | B/T | Trustee |
| 5/13/09 | Deed of Trust | B/T | Trustee |
| 5/18/09 | Warranty Deed | Tommy Hurst | B/T |

These transfers are without limitation of others that have and/or may be discovered.

79.    Church JV was never advised of these transfers.

80.    None of the transfers were revealed by Debtors in the Case.

81.    In their Schedule J filed in the Case, Debtors report total monthly income from employment of $888.  The Debtors deny having other income from any other source.  (*See* Statement of Affairs, item #2.)  However, discovery has revealed that Debtors have received and personally spent and continue to spend over $24,850 per month (equating to over $300,000 per year) for personal living expenses.  For example and without limitation during the year prior to filing:

      a.    A monthly average of $5,877 was deposited into Margaret Blasingame's household account (Community South account #11048972) and

**FIRST AMENDED ORIGINAL COMPLAINT – Page 15**

spent for personal living expenses from various sources including transfers from all the Trusts and Corporations and from a commingled "clearing account" (BancorpSouth account #87822680) into which hundreds of thousands of dollars from multiple sources are deposited each year. This clearing account is concealed from creditors in the son's name, E. B. Blasingame, Jr., although the son appears never to have written or signed a check and over which the Debtors exert full control and exercise single signatory authority.

b.      Benard Blasingame made charges averaging $1,863 per month on a credit card (Regions account #11509) issued in the name of his deceased mother, Mavoureen Blasingame, who passed away in 2004. These charges are paid with monthly deposits from multiple sources and used for Benard Blasingame's "clothes," "groceries," "meals," football tickets, a $2,130 bracelet for his wife's birthday, etc.

c.      The Debtors produced only three (3) months of statements and cancelled checks for the Residence Trust account (Hardin County Bank account #25004662) during which average monthly expenses of $12,194 per month were paid for the upkeep and maintenance of the Debtors' residence, the 28-acre gated "estate" including payment of all utilities, the security system, taxes, insurance, telephones, complete maid service, pool and tennis court maintenance, three (3) regular groundskeepers and the repair and replacement of the requisite equipment, vehicles, tractors and supplies.

d.      In addition to the deposits made to cover their credit card charges and the moneys paid to maintain their residence and grounds, the Debtors write frequent checks and make cash transfers to themselves from the accounts of the five (5) Corporations and three (3) Trusts. During the twelve (12) month period just prior to filing, no less than 71 additional checks totaling $107,630 were drawn upon the various Corporate and Trust accounts and paid to the Debtors. Among these were checks totaling $54,607 from Flozone Services, Inc. to E. Benard Blasingame who claims to be the "unpaid" vice president of Flozone.

82.     Collectively, the payments directly to or for the benefit of the Debtors spent on their regular monthly living expenses as recited above exceed $300,000 per year. Regardless of source, this amount constitutes the true annual income of the Debtors which should have been reported by the Debtors in their Statement of Affairs, items #1 and #2, either as "income" or as "income from sources other than employment." This income figure is likely still understated in the face of the complexity and commingling occurring between the 21 newly discovered checking, savings and investment accounts which Debtors overtly failed to disclose in their Schedules and Statement of

**FIRST AMENDED ORIGINAL COMPLAINT – Page 16**

Affairs.  In response to Schedule B, item #2, Debtors under oath reported that they had no checking, savings or other accounts.  No less than 10 of these 21 accounts are in the individual names of the Debtors and the other accounts are in the names of the Trusts and Corporations over which Debtors exert unrestricted single signatory authority.

83.     The Debtors over a long period of years have and continue to so completely and regularly commingle the assets of the three (3) Trusts and the five (5) Corporations with their own individual assets and accounts such that the assets of the individuals, the Trusts and the Corporations are, in fact, and should, as a matter of law, be considered assets of the Debtors, subject to the claims of Church JV.

84.     More specifically, for example and without limitation, the following pattern of transactions occurred during the one-year period prior to the filing of the Case and has continued thereafter:

> a.     The Debtors now admit to having created a "clearing account" (BancorpSouth account #87822680), established in the name of their son, into which they regularly commingle funds from every source - individual funds, Trust funds and Corporate funds.  Initially, the Debtors asserted that they established this "clearing account" to permit their bookkeeper, Joyce Long, to write checks because she supposedly could not write checks on the Trust accounts.  Subsequently, the Debtors now admit that their bookkeeper was, in fact, signatory on all the Trust accounts and continued to write checks on all the Trust accounts, before and after this "clearing account" was established.  Thus, this BancorpSouth account operated as a depository into which individual funds, Trust funds and Corporate income were regularly "commingled," safe from creditors under their son's name, and then disbursed to or for the benefit of the Debtors.  Plaintiff assert that all funds deposited into this "commingling account," accessible by the single signature of either of the Debtors, became Debtors' property as a matter of law and remained such thereafter.  The Debtors exercised their single signatory authority on this "commingling account" at BancorpSouth, and during the twelve (12) month period prior to their filing, deposited $270,210 into the account and withdrew $279,879 from the account.  The deposits came from various sources including the three (3) Trusts and five (5) Corporations with significant amounts coming from unidentified "cash deposits."  The Debtors have yet failed to produce copies of the deposits, copies of items deposited or the check registry.  A significant number of checks (some $189,000) were written in "even amounts" back and forth between

the Trusts, the Corporations and to the Debtors and/or for their benefit.

      b.    For example, from GF Corporation account #1700-935-8 at Bancorp South, the following transfers were made by the Debtors, although GF Corporation is allegedly dormant had no active business:

| | |
|---|---:|
| Unidentified cash deposits | $15,886.00 |
| Transfers from Investment Trust acct. #87138848 | 89,600.00 |
| Cash withdrawals by Debtors | 2,000.00 |
| Transfer to Bancorp South acct. #87822680* | 3,300.00 |
| Transfers to unknown account | 1,500.00 |
| Check to buy Margaret's new Mercedes | 70,165.83 |

      * the "commingling account"

      c.    For example, from Blasingame Farm, Inc. account #25000071 at Hardin County Bank, the following transactions were made by the Debtors during the one-year period prior to filing:

| | |
|---|---:|
| Crop lease deposit - Fullen land | $50,000.00 |
| Transfer to BancorpSouth acct. #87822680* | 8,500.00 |
| Cash to Benard Blasingame | 11,667.79 |
| Transfer to Residence Trust | 1,100.00 |
| Transfer to Aqua Dynamics | 7,500.00 |
| Transfer to GF Corporation | 1,000.00 |
| Cash deposit | 5,000.00 |
| Transfer to Fiberzone Technologies | 2,000.00 |
| Transfer into Business Investment Trust | 16,277.50 |
| Cash debits (destination unknown) | 47,000.00 |

      *the "commingling account"

      d.    From the commingled "clearing account" (BancorpSouth #87822680) and the other twenty (20) undisclosed accounts, the Debtors transferred funds to themselves with which to pay their personal credit card bills. During the twelve (12) month period preceding the filing, Benard Blasingame deposited $18,067 into the credit/debit card account that was opened in the name of his deceased mother, Mavoureen Blasingame (died in 2004) (Regions account #11509) and made $27,623 in charges for clothes, groceries, gasoline, entertainment, etc. and $2,130 for "Margaret's bracelet for BD [birthday]." Equally conspicuous are multiple charges for airline tickets and restaurant bills to Katherine's North Carolina wedding ($9,000+) and tickets and travel to UT football games.

85.    Further, although MGB in her Schedules reported driving a 1985 Mercedes worth

**FIRST AMENDED ORIGINAL COMPLAINT – Page 18**

only $1,000, on Christmas Eve, December 24, 2007, just eight (8) months prior to filing in the case, she purchased a 2008 Mercedes automobile for her personal use.  She made the initial deposit of $2,439.55 from her undisclosed personal checking account and subsequently $70,165.83 was paid by GF Corporation, a company without employees holding only certain patents, etc. and exclusively controlled by EBB.  MGB admits that she is only the titular President of GF Corporation and is not an employee of GF Corporation and provides no service to that corporation.  MGB has suggested that the 2008 Mercedes really belonged to her daughter - - who likewise has absolutely no connection whatsoever to the GF Corporation - and then admitted that the vehicle was parked in her garage and that she (and not her daughter who lives outside of Nashville, Tennessee and not at the Adamsville residence) is the primary driver.

86.     MGB over a period of years deposited her "personal payroll checks" from her job as a school teacher along with an annuity paying $498 per month (also undisclosed) into an account at Community South Bank (account #3081672) which account was shielded from creditors in the name of the BRT.  This accumulated salary and annuity payment were then used to purchase a $90,641 Certificate of Deposit within months of filing.  The Certificate of Deposit was likewise placed into the name of the BRT so as to be beyond the reach of Debtors' creditors.  Neither this CD nor the annuity nor the paycheck account was disclosed in the Debtors' Schedules or SOFA filed in the Case.  These funds are, in fact, the personal savings of Margaret Blasingame.  Plaintiff asserts that the transfer of these funds into the name of the BRT was done with the specific intent to conceal these assets beyond the reach of creditors and clearly constitute property of the estate which Debtors willfully concealed from this Court and the Trustee.

87.     In their Schedule B filed in the Case, Debtors assert they own only $4,000 in household furnishings and deny owning any boats, farm equipment, crops, etc. or other personal

property.  In the inspection/appraisal taken of Debtors' residence shortly after the filing of the case, a furnishings/antique expert engaged by Plaintiff itemized some $200,000 in furnishings in the principal residence along with two boats, tractors, two trucks, farm equipment, two four-wheelers, two barns "full" of segregated antiques, mowers, pool equipment, a gun collection, horse tack and some eleven Oriental rugs (Tabriz, etc.).  All of these items are physically located at the Property.

88.     There have been and continue to be intra-company loans made by Debtors to FSI. Debtors loaned FSI not less than $225,000.  EBB stated that this money is a reflection of FSI's use of his personal credit card.  Thus, FSI owes EBB $225,000 which was concealed from creditors and demonstrates an improper use of FSI.

89.     The interrelationship between the Debtors, the Trusts and the Corporations named in this action, as same has been utilized for years, constitutes a contrived scheme employed by Debtors to defraud creditors.  Similarly, most Trusts with an independent trustee require the calculation and payment of reasonable set living expenses, which could be levied by creditors. Along the same line, salary from any of the Corporations, of course, is subject to garnishment, as would be loan repayments, etc.  However, the Debtors as corporate officers and trustees have established a set of circumstances where they are supposedly "unpaid" employees and trustees with no obligation to pay any set sum.  As such, a garnishment upon any of the Corporations would receive a response "no salary due," even though some $107,630 is paid yearly by the Corporations to the Debtors or for their benefit.  Similarly a levy upon any of the three (3) Trusts would receive a response "nothing due" because all payments to the Debtors are discretionary in the sole discretion of the Debtors, even though over $200,000 per year is paid by the Trusts to or for the benefit of Debtors. The $300,000+ transferred to or for the benefit of the Debtors each year, when it leaves the Trust or Corporation clearly becomes an asset of the Debtors available to creditors

**FIRST AMENDED ORIGINAL COMPLAINT – Page 20**

which has been insulated by this scheme to defraud.

90.     In furtherance of this scheme to defraud creditors, Debtors willfully and knowingly utilize the Trusts and Corporations to conceal and shelter personal assets beyond the reach of creditors.  A clear example is –MGB's deposit of her teacher's salary, some $2,942.16 per month, along with a $498 per month annuity payment <u>for a period of years</u> into an account set up at Community South Bank established singularly for that purpose.  Yet the account was opened in the name of the BRT and the $90,641 Certificate of Deposit purchased from it was placed in the name of the Trust so that it could not be levied for the obvious and singular purpose of avoiding creditors.  As evidence of Debtors' specific intent to avoid creditors, when a garnishment was issued upon MGB's teacher's salary, she immediately resigned her employment to thwart collection.  It likewise appears that inheritances received by the Debtors, obviously personal assets, have been sheltered in the Trusts, rendering them subject to being claimed to be "self-settled."

91.     As further evidence of Debtors' conscious scheme to utilize the Trusts and Corporations to defraud creditors is the account at BancorpSouth (#87822680) – the so-called "Clearing Account" - which was opened in the name of Debtors' son in order that its contents be safe from levy.  Funds belonging to each of the Trusts, each of the Corporations and from one or more of the ten (10) separate bank accounts in Debtors' own names were and still are deposited, transferred back and forth as needed into the Clearing Account.  When substantial income is generated from a land sale, e.g., when BFI receives a crop lease payment or just when one of the entities needs money, funds flow into and out of the Clearing Account and in many instances simply directly from/to the individuals, Trusts and Corporations themselves.  Collectively, for years the Trusts and Corporations have been consciously and intentionally ignored corporate and trust formalities, choosing instead to utilize them for the single purpose of thwarting and

**FIRST AMENDED ORIGINAL COMPLAINT – Page 21**

defrauding creditors.

92.     Debtors assert that the Trusts (in reality some six (6) Trusts which have evolved into or have been consolidated into the three (3) remaining Trusts) were established years ago in or about 1993 with the assistance and contribution of assets by EBB's mother, Mavoureen Blasingame.  It is clear, however, that whatever initial contributions were made by Mavoureen Blasingame, that greater amounts have long since been distributed over the ensuing 16 years to the Debtors and their children in support of their lifestyle, such that it is now impossible to account whether the present Trust assets came from a third party settler or from the Debtors who deposited their salaries, their substantial inheritances and personal assets into the shelter of the Trusts so as to render them "self-settled" in whole or part for the specific purpose of evading creditors.  This factor, together with the extreme pattern and practice of the Debtors to draw funds regularly and at will directly from all five (5) Corporations and three (3) Trusts, treating the assets of each as their own personal assets, has rendered the entities nothing more than the alter egos and instrumentalities of the Debtors and their assets subject to the claims of Church JV.

## FIRST CAUSE OF ACTION – DECLARATORY RELIEF

93.     Church JV repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 92 above as if fully set forth herein.

94.     Church JV assert that the three (3) Trusts and five (5) Corporations named in this action have been used for an improper purpose and are and should be declared to be the alter egos of the Debtors, are shams to thwart, deceive and conceal assets from the claims of Church JV, a creditor of Debtors, and have been so misused and whose assets have been so repeatedly commingled that the assets of same should be considered to be the assets of Debtors and made available to satisfy the claims of Church JV.

**FIRST AMENDED ORIGINAL COMPLAINT – Page 22**

95.     The three (3) Trusts and the five (5) Corporations named in this action  are, in fact, alter egos and instrumentalities of the Debtors who have and exert unrestricted control and access and engage in a consistent pattern of transfer between and commingling of each entity's assets in a manner such that their assets are the commingled assets of the Debtors.

96.     The three (3) Trusts and five (5) Corporations named in this action are, separately or collectively, the alter egos and/or reverse alter egos of Debtors and serve only as the instrumentality and as agents of the Debtors such that their assets should be considered the assets of Debtors and made available to satisfy the claims of Debtors' creditors.

97.     Accordingly, Church JV seeks a declaration from this Court that the three (3) Trusts and five (5) Corporations named in this action have effectively lost their independent status as may have been originally designed and have been and are now being used as devices and artifices exclusively to hinder, delay and defraud Church JV, a creditor of Debtors, all as clearly indicated by the transfers and transactions noted above, without limitation.  28 U.S.C. § 2201(a).

98.     Church JV is aware that FSI may have some class B shareholders and that each of the other four (4) Corporations and the three (3) Trusts involved in this action may have certain mortgage and other indebtedness that equitably may need to be recognized and accommodated so as not to impair legitimate interests of innocent banks and third parties, as the case law directs; however, Church JV asserts that those interests are easily accommodated and the turnover and/or subsequent sale of the assets at issue will produce substantial net income to without impairing the interest of innocent stakeholders.

## SECOND CAUSE OF ACTION – TO SET ASIDE AND AVOID TRANSFERS

99.     Church JV repeats and incorporates each and every allegation contained in paragraphs 1 through 98 above as if fully set forth herein.

**FIRST AMENDED ORIGINAL COMPLAINT – Page 23**

100.    This Court may set aside and avoid any transfer of an interest of the Debtors in property or any obligation incurred by the Debtors that is voidable under applicable law by a creditor holding an unsecured claim.

101.    More specifically, Church JV asserts that the Debtors' transfers of assets and property by and between Debtor, the Trusts and Corporations noted herein, as recited above, as well as any other transfers which may be demonstrated, were with the specific intent, direct or indirect, of delaying, hindering, or defrauding Church JV and other creditors and, therefore, were fraudulent conveyances and devices within the meaning of applicable Tennessee avoidance law, *see* T.C.A. 66-3-101 et seq., and subject to being avoided for the benefit of Church JV within the meaning of T.C.A. 29-12-101 et seq. and should be set aside and avoided by the Court.

## THIRD CAUSE OF ACTION – INJUNCTIVE RELIEF

102.    Church JV repeats and incorporates each and every allegation contained in paragraphs 1 through 101 above as if fully set forth herein.

103.    Church JV has always maintained that the Trusts and Corporations involved in this action, which are related to Debtors, possess property of the Debtors.'  Debtors have been placed upon notice that undisclosed assets are being sought; yet, on information and belief, Debtors continue to spend, transfer, commingle and encumber assets to support their lifestyle.

104.    Debtors have taken and will likely take actions which have and will cause Church JV irreparable harm unless they, as well as the entities in which they are -closely aligned and involved, are restricted from making any further transfers of assets in some reasonable manner by injunction according to guidelines set by this Court.

105.    Furthermore, since all of the transfers were or are for the benefit of Debtors, directly or indirectly, it can hardly be said that an injunction would cause harm to others.

106.    Finally, the public interest in seeing that all legal and equitable assets are under of the proper party far outweighs any claim Debtors might have to justify transfers of assets at this stage and state of the proceedings.

### FOURTH CAUSE OF ACTION – ACCOUNTING

107.    Church JV repeats and incorporates each and every allegation contained in paragraphs 1 through 106 above as if fully set forth herein.

108.    Church JV requests that the Court order and direct Defendants, as well as any other entities in which they have control or a controlling interest, to provide to Church JV and, if necessary, file with the Court a full and proper accounting of all assets held by them throughout their existence and all subsequent transfers of property, real or personal, by them, as well as any other entity which they control or have a controlling interest.

### FIFTH CAUSE OF ACTION – RECOVERY OF ATTORNEYS' FEES AND COSTS

109.    Church JV repeats and incorporates each and every allegation contained in paragraphs 1 through 108 above as if fully set forth herein.

110.    Plaintiff seeks recovery of reasonable and necessary attorneys' fees and expenses incurred in prosecuting this action, as well as pre-judgment and post-judgment interest, to the extent permitted by applicable law.

111.    Plaintiff seeks recovery of all costs of court as may be allowed by the Court in prosecuting this action.

WHEREFORE, PREMISES CONSIDERED, Church JV prays that upon consideration of this action, the Court will enter a judgment in favor of Church JV for the relief requested and grant Church JV any further relief to which it may show itself to be justly entitled under the circumstances.

Dated:  June 14, 2013.                    Respectfully submitted,

                                          **CANTEY HANGER LLP**

                                          By:    /s/ Bruce W. Akerly
                                                 Bruce W. Akerly
                                                 State Bar No. 00953200

                                          1999 Bryan Street, Suite 3300
                                          Dallas, Texas 75201-3100
                                          (214) 978-4129 telephone
                                          (214) 978-4150 facsimile

                                          COUNSEL FOR PLAINTIFF
                                          CHURCH JOINT VENTURE.
                                          A LIMITED PARTNERSHIP

## CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiff certifies that a true and correct copy of the foregoing

pleading was forwarded by electronic mail and first class mail, postage prepaid, to the following

persons on June 14, 2013:

**Attorneys for Debtor Defendants**

David J. Cocke
Evans Petree, PC
1000 Ridgeway Loop Road, Suite 200
Memphis, TN 38120

**Attorneys for Non-Debtor Defendants**

Michael P. Coury
Glankler Brown, PLLC
6000 Poplar Ave., Suite 400
Memphis, TN 38119

                                          /s/ Bruce W. Akerly
                                          Bruce W. Akerly

**FIRST AMENDED ORIGINAL COMPLAINT – Page 26**